COMPAGNIE FRANCAISE D'ASSURANCE POUR LE COMMERCE EXTERIEUR and Constructions Navales Et Industrielles De La Mediterranee, Plaintiffs,

v.

PHILLIPS PETROLEUM COMPANY, Defendant.

No. 81 Civ. 4463 (JFK).

United States District Court, S.D. New York.

Dec. 10, 1984.

James J. Hagan, John J. Kenney, Michael J. Chepiga, Mary Elizabeth McGarry, Simpson, Thacher & Bartlett, New York City, for plaintiffs.

Herbert M. Wachtell, Meyer G. Koplow, Warren R. Stern, Wachtell, Lipton, Rosen & Katz, New York City, for defendant.

## OPINION AND ORDER

KEENAN, District Judge:

This matter is before the Court on discovery motions by plaintiffs and defendant. Plaintiffs in this diversity case are two French corporations. The first is Compagnie Francaise d'Assurance Pour le Commerce Exterieur ("COFACE"), a national company and an agency of the French government that insures French companies against the risk of nonpayment on export contracts. The second plaintiff is Constructions Navales et Industrielles de la Mediterranee ("CNIM"), a French company that builds ocean-going vessels in its shipyard. The defendant is Phillips Petroleum Company ("Phillips"), a Delaware corporation.

The facts stated below are asserted or pleaded, and assumed to be true for purposes of this decision. In 1974 CNIM entered into two contracts with Multinational Gas and Petrochemical Company ("Multinational"), which, until its dissolution in 1977, was a Liberian corporation engaged in the carriage of liquified hydrocarbons by sea, and the purchase and sale thereof. The shareholders of Multinational were Societe Anonyme de Gerance et d'Armement ("SAGA"), a French corporation, Bridgestone Liquified Gas Co., Ltd., a Japanese corporation, wholly owned by Mitsui & Co., Ltd. ("Mitsui"), another Japanese corporation, and Philtankers Inc., another Liberian corporation which is in turn a subsidiary of Phillips.

The two 1974 contracts called for CNIM to construct two liquified petrochemical gas tankers ("Newbuildings 1416 and 1417") at its shipyard in La Seyne-Sur-Mer, France. Multinational agreed to purchase the vessels for approximately 227,770,000 French Francs (approximately $46,500,000 each). COFACE, the export insurance agency of the French government, insured CNIM against any risk of nonpayment by Multinational. Progress payments were made regularly under both contracts until September of 1977 at which point Multinational became insolvent. At that time Multinational sent a telex advising CNIM of its dire financial position and instructing CNIM to cease further construction on the vessels. Thereafter, Multinational made no further payments. In October of 1977 it filed Articles of Dissolution in Liberia.

CNIM subsequently completed the two vessels and sold them in 1979 to a Mexican and a Swiss company, respectively, at prices below those in the original contract. CNIM alleges that the losses on its contract with Multinational were approximately $32,123,000. COFACE has allegedly indemnified CNIM to the extent of approximately $21,095,000, leaving the shipbuilder with a non-indemnified loss of approximately $11,064,000.

Plaintiffs assert here that Phillips is responsible to them for the damages suffered by CNIM as a result of Multinational's breach of contract. In support of this claim they allege that (1) Phillips (along with Mitsui and SAGA) dominated Multinational and operated the company as an "alter ego"; (2) CNIM was induced to enter into the contracts with Multinational on the basis of representations by Phillips that it would stand behind the obligations of Multinational; and (3) Multinational was acting as an agent of its shareholders when it contracted with CNIM.

In its answer, Phillips denies any liability and asserts several affirmative defenses including, *inter alia,* that: (1) CNIM had no basis for relying on the credit of Phillips in transacting business with Multinational; (2) there is no writing to support plaintiffs' claim that Phillips represented that it would answer for Multinational's debts; and (3) CNIM failed to take reasonable steps to mitigate damages.

Four motions are before the Court: (1) Defendant's motion to compel production of documents; (2) Defendant's motion to compel production of French Ministry documents; (3) Plaintiffs' motion for an order directing separate trials on the issues of liability and damages and for an order staying discovery pertaining to damages; and (4) Plaintiffs' motion to compel production of documents and answers to interrogatories.

## I. *Defendant's Motion to Compel Production of Documents*

### A. *Procedural Background*

On March 31, 1981, defendant served plaintiffs with "Defendant's First Request for Production of Documents," pursuant to Rule 34 of the Federal Rules of Civil Procedure ("FRCP") and Articles 16 and 17 of the Hague Convention on the Taking of Evidence Abroad, March 18, 1970, 23 U.T.S. T.I.A.S. No. 7444 ("Hague Convention"). On April 2, 1982, Judge Brieant issued a commission permitting any United States consular officer in Paris to obtain from COFACE and CNIM any responses or objections to defendant's document request. In a stipulation and order dated March 30,

1982, the parties agreed, in conjunction with document requests taken pursuant to Rule 34 of the Federal Rules of Civil Procedure, to use commissions as provided in the Hague Convention.

In the request defendant asked for the following:

"1. All documents relating or referring to Newbuildings 1416 and 1417, including, but not limited to, documents constituting or referring to negotiations, credit analyses, contracts, modifications to contracts, termination of contracts, decisions as to termination or non-termination of construction, demands for payments, negotiations for sale of the ships to entities other than Multinational, contracts for resale of the ships and terms of such resale (including commissions paid), and payments and agreements as between COFACE and CNIM.

2. All documents relating or referring to Multinational [Gas and Petrochemical Company, Multinational] Services [Inc., also owned in part by Phillips], Malmros Rederi, A.B., [a Swedish shipping company which apparently intended to acquire an interest in Multinational's contract] the stockholders of either Multinational or Services or the parents of such stockholders, including, but not limited to, credit analyses, and documents relating or referring to negotiations or agreements (including settlement agreements) with such companies whether with respect to Newbuildings 1416 or 1417 or otherwise." [Matter in brackets added.]

On July 15, 1982 plaintiffs produced a number of documents at the United States Embassy in Paris. However, plaintiffs objected to producing documents:

(a) "concerning the resale of Newbuildings 1416 and 1417" (other than the actual resale contracts), or

(b) "which memorialize the deliberations and decision making processes of certain agencies of the French Government," or

(c) "which reflect classified information concerning dealings between CNIM and the French Government." (Plaintiffs' Objections to Defendant's First Request for the production of documents, dated July 15, 1982.)

Before Judge Brieant, plaintiffs advanced various grounds as the bases of their objections, including that (1) the requested documents fell within the doctrines of governmental and executive privilege; and (2) they were prohibited from producing the documents by the terms of Article One of French Law No. 80–538.

In his January 23, 1983 memorandum and order ("Brieant Op."), Judge Brieant rejected plaintiffs' claim of executive privilege. He acknowledged that "under appropriate circumstances a foreign government should be permitted to assert a claim of Executive Privilege." Brieant Op. at 7. Judge Brieant went on to find, however, that the conclusory statements of plaintiffs' officials did "not permit this Court to evaluate the claim of privilege, and they fail to demonstrate that the 'matters for which they seek protection are in the same class as those for which the states secrets privilege has been recognized.'" *Id.* at 8–9 (quoting *Republic Steel Corp. v. United States,* 538 F.Supp. 422, 423 (U.S.Ct.Int'l Trade 1982)).

Judge Brieant also considered whether plaintiffs were precluded from producing the requested documents by Article One of French Law No. 80–538. The statute, which includes criminal sanctions, prohibits a French party from disclosing any document when such disclosure would infringe upon the sovereignty, security or essential economic interests of France. Judge Brieant first found that the requested documents do fall within the prohibitions of the French statute. Brieant Op. at 10. He then ruled that under the Hague Convention, which is a treaty of the United States having both United States and France as signatories, plaintiffs have a right to refuse to provide evidence covered by Article One. Judge Brieant, however, recognized that the Federal Rules of Civil Procedure and the somewhat broader discovery devices authorized therein, also constitute the law of the land. *Id.* at 11.

In order to give effect to both the FRCP and the Hague Convention, the Court directed plaintiffs to seek a waiver of Article One to allow production of the requested documents. Absent a blanket waiver, the plaintiffs were directed to seek waivers for those documents that appeared to be within the terms of the French statute, but not within its historical purpose. *Id.* at 11–14. The parties were also directed to obtain any requested materials from non-French sources where it was possible. *Id.* Finally, plaintiffs were directed to specify those documents not otherwise accessible for which a waiver could not be obtained. *Id.* Defendant's motion to compel production of documents was held in abeyance. *Id.*

Pursuant to Judge Brieant's order, plaintiffs assert they have obtained permission from the French government to produce, in whole or in redacted form, 133 of 186 of the documents at issue before Judge Brieant. Since Judge Brieant's order, Phillips has conducted several more depositions and requested hundreds of more documents. Plaintiffs sought waivers for these so-called "new" Article One documents and received permission to produce, in whole or in redacted form, 923 of 1,018 of these documents. Thus, plaintiffs contend that they have produced, in whole or in part, 1056 of the 1204 requested documents. The French government refused to waive Article One for 148 documents and portions of many more.

Defendant, not satisfied with the materials plaintiffs have produced, reinstitutes its motion to compel production of documents pursuant to its first document request concerning the "old" Article One documents at issue before Judge Brieant. Plaintiffs contend they have complied with the substance of Judge Brieant's order regarding the "new" Article One documents as well as the "old." Therefore, the Court's rulings will apply to both "old" and "new" Article One documents. For the reasons stated below, defendant's request for an order to produce all documents heretofore withheld by plaintiffs on the basis of Article One is granted.

### B. *Discussion*

It is well established that mutual knowledge of all relevant facts is essential to proper litigation. *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947). To that end, the Federal Rules of Civil Procedure authorize either party to compel the other, with limited exceptions, to disgorge whatever relevant documents it has in its possession. Plaintiffs, however, resist disclosure of documents on two grounds: (1) Executive Privilege [1] and, (2) Article One and the Hague Convention.

#### 1. *Executive Privilege*

Judge Brieant's analysis of executive privilege need not be disturbed. He determined that COFACE could not avail itself of the privilege as its claim had been previously presented. He ruled, however, that such a claim could be sustained if COFACE could state the basis with enough particularity to allow the Court to determine whether the requested materials came within the ambit of the state secrets privilege. Brieant Op. at 7–9; *see Mobil Oil Corp. v. Department of Energy,* 520 F.Supp. 414, 416 (N.D.N.Y.1981); *Kinoy v. Mitchell,* 67 F.R.D. 1, 8 (S.D.N.Y.1975).

COFACE has provided a list, furnished by the relevant French ministries, of those documents not given to Phillips. The list provides a brief description of the document, along with its date, length, origin and recipient. The list also identifies one or more of three reasons for nondisclosure: (1) information relates to government subsidiaries; (2) information affects the international economic relations of France; or (3) information involves confidential interministerial deliberations. COFACE contends that this information satisfies the particularity requirement and that it is not possible to provide further particulars without divulging the very confidences sought to be preserved. We disagree.

---

1. Judge Brieant found that CNIM could not assert executive privilege. Only COFACE, therefore, is seeking the protection afforded by the privilege.

The information supplied to the Court does not afford a sufficient basis on which to make a determination of whether the withheld documents are akin to state secrets. COFACE's contention that more information cannot be provided without divulging confidential information begs the question. To sustain generalized assertions of confidentiality on this basis would give any government-plaintiff the ability to frustrate discovery and unfairly disadvantage its adversary.

The Court notes two additional considerations. First, the information furnished does not appear to support a claim of executive privilege. Historically, the claim has only been sustained to protect important military secrets, *United States v. Reynolds*, 345 U.S. 1, 6–8, 11, 73 S.Ct. 528, 531–532, 533, 97 L.Ed. 727 (1953); extremely sensitive foreign policy questions, *Republic of China v. National Union Fire Ins. Co.*, 142 F.Supp. 551, 556 (D.Md.1956), and other national security-related issues, *e.g., Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir.1978) (intelligence collection systems); *Sigler v. Le Van*, 485 F.Supp. 185, 192–94 (D.Md.1980) (seized memoirs of counterintelligence officer); *Spock v. United States*, 464 F.Supp. 510, 518 (S.D.N.Y.1978) (intelligence information); *Jabara v. Kelley*, 75 F.R.D. 475, 489 (E.D.Mich.1977) (foreign-based international terrorist movement). Thus, information that was not disclosed because it "related to government subsidiaries" or "affected the international economic relations of France" seems to fall outside the protection afforded military and diplomatic secrets.

■ Inter-ministerial deliberations may receive protection. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.1966), *aff'd*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967);

*Mobil Oil*, 520 F.Supp. at 416. Such a claim must specifically designate and describe the information purportedly privileged and the precise reasons for preserving the confidentiality of the requested information. *Mobil Oil*, 520 F.Supp. at 416; *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 517–19 (D.Del.1980). COFACE's claim, as discussed above, is neither described nor justified with sufficient particularity. Thus, the claim of executive privilege cannot be sustained.

■ Moreover, the state secrets privilege is only evidentiary, *Reynolds*, 345 U.S. at 6–7, 73 S.Ct. at 531–532, and should be narrowly construed to permit "the broadest possible discovery consistent with the purposes of the privilege." *Spock*, 464 F.Supp. at 519 (quoting *Kinoy*, 67 F.R.D. at 14); *see United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *Jabara*, 75 F.R.D. at 480. As Judge Brieant has pointed out, the executive privilege in the United States is premised on a concern that any release of confidential government information to a coordinate and equal branch of government would offend the principle of separation of powers and be detrimental to the public interest. Brieant Op. at 5. The French statute, however, upon which COFACE relies in support of its asserted need for confidentiality, is addressed only to the release of information to "foreign public authorities." As Judge Brieant said: "It is obviously not the product of a need for complete government confidentiality in certain circumstances, but apparently reflects an expression of policy on the part of the French government with respect to foreign requests for information." *Id*. It is unlikely, therefore, that the Court would find any of the documents in question insulated from disclosure on the basis of a claim of executive privilege.[2] For the reasons stat-

---

2. Indeed, even if the privilege had been properly invoked, the Court would likely have been inclined to find that COFACE, by instituting this action, waived the privilege. *See Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 594 (D.Mass.1979); *FDIC v. St. Paul Fire & Marine Ins. Co.*, 53 F.R.D. 260, 262 (W.D.Okla. 1971); *United States v. Continental Can Co.*, 22 F.R.D. 241, 245 (S.D.N.Y.1958). *But see Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 64–65 (N.D.Ohio 1964) (balancing defendant's need for the information against plaintiff's need for maintaining secrecy).

ed above, COFACE's claim of Executive Privilege is denied.

### 2. *Article One of French Law No. 80–538*

Plaintiffs also contend that they are precluded from producing the requested documents by Article One of French Law No. 80–538. This statute prohibits a French party from disclosing any document if such disclosure would infringe upon the sovereignty, security or essential economic interests of France. Article One states:

> Subject to international treaties and agreements, any physical person who is of French nationality or habitually resides in French territory, and any manager, representative, agent or employee of a legal entity which has its registered office or a place of business in France is prohibited from communicating, in writing, orally or in any other form, in any place whatsoever, to foreign public authorities, economic, commercial, industrial, financial or technical documents or information, the communication of which is to infringe upon the sovereignty, security or essential economic interests of France or upon the public order, as specified by the administrative authority to the extent that may be required. (Ex. C to Affidavit of Herbert M. Wachtell, sworn to Oct. 8, 1982).

Article Two of this law requires any person who is the recipient of a request for potentially prohibited information to inform the French Government of the request. Article Three authorizes the imposition of criminal penalties, including up to six months in prison and a fine of 120,000 Francs (approximately $20,000) for a violation of the provisions of Article One. Judge Brieant found that the requested documents fell within the prohibitions of the French statute.[3] Brieant Op. at 10. The Court sees no reason to disturb that finding.

Simply because production of the requested documents is precluded by French law, however, does not settle this discovery dispute in the Southern District of New York. *Id.* Two questions arise. First, does this Court have the power to order production of documents in France in the face of Articles 11 and 21 of the Hague Convention which permit a party confronted with a statute such as Article One to refuse to give evidence? According to plaintiffs, because the United States is a signatory to the Convention, this Court is bound by its provisions and must allow plaintiffs to refuse to produce the documents. Plaintiffs argue that the Articles of the Hague Convention withdraw from this Court the right to employ the discovery devices provided in the Federal Rules of Civil Procedure because they conflict with the provisions of French Law No. 80–538. If the Court decides that the Hague Convention provisions are exclusive and mandatory, the Court will have no authority to issue a production order. Second, even if the Court finds the Convention provisions to be discretionary, do considerations of comity still compel the Court to exercise judicial restraint and not order production?

#### a. *Hague Convention*

■ The Hague Convention is an international treaty designed to bridge the differences in the taking of evidence between common law and civil law countries. In civil law countries, such as France, the taking of evidence before trial is accomplished primarily by the courts. In common law countries, like the United States, evidence is gathered by lawyers; it is a more private matter. As a result, when American lawyers—prior to the Hague Convention—sought to take evidence in a civil law country, it was sometimes considered an unlawful usurpation of the public judicial function and an illegal intrusion on the nation's judicial sovereignty. The Hague Convention was designed to establish a method for taking evidence that would be tolerable to the state where the evidence is located and useful in the forum

---

**3.** *But see Wilson v. Stillman & Hoag, Inc.,* 121 Misc.2d 374, 467 N.Y.S.2d 764, 765 (Sup.Ct.N.Y. Cty.1983) (certain discovery outside prohibitions of French statute).

state. *See Report of the United States Delegation to the Eleventh Session of the Hague Conference on Private Int'l Law*, 8 Int'l Legal Materials 785, 806 (1969).

Although it has been argued that the Hague Convention is the exclusive means of discovering evidence abroad, *e.g.*, Comment, *The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters: The Exclusive and Mandatory Procedures for Discovery Abroad*, 132 U.Pa.L.Rev. 1461, 1464–65 (1984) [*Mandatory Procedures*], the weight of judicial opinion is clearly to the contrary. In *Lasky v. Continental Products Corp.*, 569 F.Supp. 1227 (E.D.Pa.1983), for example, the court refused to grant a German defendant a protective order against interrogatories and a request for production of documents because the Convention is "permissive and not mandatory." *Id.* at 1228. The Court relied on Article 27 of the Convention which it interpreted as permitting a signatory nation to allow more liberal discovery than that authorized by the Convention. *Id.* Judge Getzendanner, in a thorough opinion in *Graco v. Kremlin, Inc.*, 101 F.R.D. 503, 522 (N.D.Ill.1984), also concluded that Hague Convention procedures are discretionary. *Graco* relies not only on Article 27 of the Convention, *id.* at 520–21, but also Article 23 which provides that signatory states can simply refuse to cooperate in pretrial discovery by failing to execute letters of request, *id.* at 522–23. Articles 23 and 27 are inconsistent with an interpretation of the Hague Convention that makes it the exclusive means of gathering evidence abroad.[4]

Indeed, several federal courts have required first resort to Hague Convention procedures. *E.g.*, *General Electric Co. v. North Star Int'l, Inc.*, No. 83–C–0838, Slip op. (N.D.Ill. Feb. 21, 1984); *Schroeder v. Lufthansa German Airlines*, No. 83–C–1928, Slip op. (N.D.Ill. Sept. 15, 1983); *Philadelphia Gear Corp. v. American Pfauter Corp.*, 100 F.R.D. 58 (E.D.Pa. 1983). But *General Electric*, slip op. at 4, and *Schroeder*, slip op. at 4 n. 1, expressly refuse to decide whether Convention procedures are mandatory and instead base their decisions on principles of comity and judicial self-restraint. *Philadelphia Gear*, 100 F.R.D. at 60 & n. 3, fails to distinguish between the two possible grounds for its decision. *See Graco*, 101 F.R.D. at 523. Two California state appellate courts have also compelled resort to Hague Convention procedures. *See Volkswagenwerk A.G. v. Superior Court*, 123 Cal.App.3d 840, 176 Cal.Rptr. 874 (1981); *Pierburg GmbH v. Superior Court*, 137 Cal.App.3d 238, 186 Cal.Rptr. 876 (1982). *Volkswagenwerk* explicitly found the Convention to be discretionary. 176 Cal.Rptr. at 885–86. *Pierburg* simply stated that Convention procedures were to be attempted prior to use of alternative methods, necessarily implying that Convention procedures are not mandatory. 186 Cal.Rptr. at 877. Thus, while courts have favored use of Convention procedures whenever possible, no court has explicitly found the Convention to be exclusive and mandatory.[5]

Traditionally, United States courts have had the power to require that a party or witness, over whom they have jurisdiction, comply with a discovery request. *See, e.g.*, *Societe Internationale v. Rogers*, 357 U.S. 197, 204–06, 78 S.Ct. 1087, 1091–93, 2 L.Ed.2d 1255 (1958); *United States v. First Nat'l City Bank*, 396 F.2d 897, 900–01 (2d Cir.1968); *United States v. Vetco*, 644 F.2d 1324, 1329 (9th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981);

---

4. It has been suggested, in fact, that one reason France enacted French Law No. 80–538 was because it too believes the Hague Convention is not exclusive. *Graco*, 101 F.R.D. at 519 n. 18 (citing 15 Int'l Law at 586 n. 4, 596–98); *contra Mandatory Procedures, supra;* at 1481.

5. The Court notes that in a reversal of an earlier stance, the Solicitor General of the United States also supports the position that Hague Convention procedures are discretionary. Brief for United States as Amicus Curiae at 8–9, *Club Mediterranee, S.A. v. Dorin*, No. 83–461 (filed with the U.S. Supreme Court Sept. 21, 1984); *cf.* Brief for United States as Amicus Curiae at 6, 11, *Volkswagenwerk A.G. v. Falzon*, 461 U.S. 1303, 103 S.Ct. 1810, 75 L.Ed.2d 924 (1983) (Hague Convention procedures are mandatory).

*Trade Development Bank v. Continental Ins. Co.,* 469 F.2d 35, 40–41 (2d Cir.1972); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1144 (N.D.Ill.1979); *Volkswagenwerk,* 176 Cal.Rptr. at 883–84. Extraterritorial discovery has been standard for some time and there is no evidence that the United States, in agreeing to comply with the Hague Convention, intended to abandon this practice. *Graco,* 101 F.R.D. at 522; Oxman, *The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention,* 37 U.Miami L.Rev. 733, 760 (1983). Philip Amram, a member of the United States delegation to the 1968 session of the Convention, stated that the Convention would effect "no major changes in U.S. procedure." Amram, *United States Ratification of the Hague Convention on the Taking of Evidence Abroad,* 67 Am.J.Int'l Law 104, 105 (1973). The Solicitor General, in the *Club Med* amicus brief, states the problems with any contrary finding:

> The consequences of such a holding would be adverse to United States interests. It would give foreign signatory states the final say in determining the extent of extraterritorial discovery to be permitted in American courts. As a result, litigants in United States courts might find it impossible to obtain necessary discovery from foreign based parties.

Brief for the United States as Amicus Curiae at 8, *Club Mediterranee, S.A. v. Dorin,* No. 83–461 (filed Sept. 21, 1984).

In recognition of this problem, Judge Leval, in the recent case of *Adidas Ltd. v. S.S. Seatrain Bennington,* No. 80 Civ. 1922, Slip op. at 5 (S.D.N.Y. May 29, 1984), ruled that the Hague Convention was inapplicable to a French defendant resisting document production in this Court.[6] A contrary interpretation, as Judge Leval ruled:

> ... would give extraordinary and unfair advantage to a French litigant in United States courts. Insofar as the French litigant sought discovery of its United States adversary, it would be permitted the full range of free discovery provided by the Federal Rules. But when the United States adversary sought reciprocal disclosure by the French party, this discovery would be limited to the cumbersome procedures and narrow range authorized by the Convention.... I find it most doubtful that the United States, in adopting the treaty, had any intention to place its nationals at such a disadvantage.

*Id.* at 6.

For the reasons stated above, the Court finds that the Hague Convention provides an alternative procedure for taking evidence abroad; its procedures are not exclusive or mandatory.

### b. *Comity and Judicial Restraint*

■ The question remains whether, as a matter of comity, the Court should defer to Hague Convention provisions rather than allowing defendant to resort to more traditional means of discovery that may offend the French government. American courts should refrain, whenever it is feasible, from ordering a person to engage in activities that would violate the laws of a foreign nation. Comity, however, is not "a matter of absolute obligation.... it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to rights of its own citizens

---

6. The Court recognizes that *Adidas* dealt with Article One *bis* and this case deals with Article One. Article One *bis* forbids the disclosure of economic, commercial, industrial, financial or technical information "intended for the establishment of evidence" in foreign proceedings, except under provisions of international law or treaties (Hagan Affidavit ¶ 3). Article One, as we have discussed, prohibits the communication of economic, commercial, industrial, financial

or technical information to foreign authorities where such communications would infringe upon "the sovereignty, security, or essential economic interests of France." *Id.* Judge Leval's ruling in *Adidas,* however, related to French Law No. 80–538. That law encompasses Article One and Article One *bis* and we hold, therefore, that Judge Leval's interpretations of Article One *bis* apply with equal force to Article One.

or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143–44, 40 L.Ed. 95 (1895).

■ In *Societe Internationale,* the Supreme Court held that the good faith of a party resisting discovery is an important factor for a district court to consider in deciding whether to impose sanctions when foreign law prohibits the requested disclosure. 357 U.S. at 212, 78 S.Ct. at 1095. The case involved a Swiss holding company that was suing for the return of property seized by the government during World War II. The district court dismissed plaintiff's complaint as a sanction for plaintiff's refusal to produce requested bank records. The Supreme Court reversed the district court's ruling, finding that the plaintiff, having been barred from producing the documents under Swiss law and having made good faith, albeit futile, efforts to have the documents produced, should not have had its complaint dismissed. *Id.* The Court, however, suggested that dismissal of a complaint would be proper when a plaintiff deliberately courted legal impediment to discovery. *Id.* at 208–09, 78 S.Ct. at 1093–94. More importantly the Court stated that the good faith of a party is only relevant in determining sanctions for non-production of materials already subject to a discovery order. *Id.* at 208, 78 S.Ct. at 1093. Under *Societe Internationale,* therefore, a foreign law's prohibition on discovery is not a bar to issuance of a discovery order.

The Second Circuit, in cases decided shortly after *Societe Internationale,* appeared to hold that a foreign law prohibition on disclosure is an absolute bar to ordering inspection or production of documents. *See Application of Chase Manhattan Bank,* 297 F.2d 611 (2d Cir.1962); *Ings v. Ferguson,* 282 F.2d 149 (2d Cir. 1960); *First Nat'l Bank v. IRS,* 271 F.2d 616 (2d Cir.1959), *cert. denied,* 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). Judge Pollack, however, has pointed out that all three of these cases dealt with a non-party witness and, in any event, "the Second Circuit has clearly moved to a more flexible position." *SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 114–15 (S.C.N.Y.1981); *see, e.g., First Nat'l City Bank,* 396 F.2d at 903–05 (adopting balancing approach in determining whether to order production); *Trade Development Bank,* 469 F.2d at 41 (affirming use of balancing approach). The Second Circuit's position, as Judge Pollack noted, 92 F.R.D. at 116, is now in accord with other Circuits and district courts that have considered the matter. *See, e.g., In re Westinghouse Elec. Corp. Uranium Contracts Litigation,* 563 F.2d 992, 997–99 (10th Cir.1977); *In re Grand Jury Proceedings,* 532 F.2d 404, 407–09 (5th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *Vetco,* 644 F.2d at 1330–33; *State of Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1373 (10th Cir.), *cert. denied,* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); *Soletanche & Rodio, Inc. v. Brown & Lambrecht Earthmovers, Inc.,* 99 F.R.D. 269, 271 (N.D.Ill.1983). *But see In re Uranium Antitrust Litigation,* 480 F.Supp. at 1148 (balancing approach "inherently unworkable" when national interests contradictory).

■ In undertaking a comity analysis, the courts must balance the competing factors involved. Some of those factors are set forth in the Restatement (Second) of Foreign Relations Law of the United States § 40 (1965), which provides:

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

### 1. *Vital National Interests*

■ Plaintiffs point out that this is a private commercial dispute which does not implicate the integrity of American antitrust laws, *e.g., In re Uranium Antitrust Litigation*, 480 F.Supp. at 1149, security laws, *e.g., Banca Della*, 92 F.R.D. at 117; or tax laws, *e.g., Vetco*, 644 F.2d at 1332. Nonetheless, the United States has a substantial interest in fully and fairly adjudicating matters before its courts. This is only possible with complete discovery. The United States also has an important interest in protecting its own nationals from unfair disadvantage when they are being sued in the courts of their own nation. Indeed, that would be the inevitable result of deferring to the French law relied on by plaintiffs.

■ At first impression, French interests also appear to be substantial. Article One is explicitly intended to protect the "sovereignty, security and vital economic interests" of France. On closer examination of French Law No. 80–538, which encompasses Article One, however, Judge Leval concluded that the "legislative history of the statute gives strong indications that it was never expected nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts." *Adidas*, Slip op. at 8; *see id.* at n. 4; *see also United States v. Gonzalez*, 748 F.2d 74, at 77–78 (2d Cir.1984) (French Law No. 80–538 intended to protect French business from foreign discovery); *Graco*, 101 F.R.D. at 508 ("The Blocking Statute obviously is a manifestation of French displeasure with American pre-trial discovery procedures, which are significantly broader than the procedures

accepted in other countries"). Therefore, France's real interests in promulgating Article One are dwarfed by American interests in complete discovery.

### 2. *Hardship*

■ Plaintiffs contend that they would endure severe hardship if they were ordered to produce the documents. Under the terms of Article Three of French Law No. 80–538, a document disclosure in violation of Article One would subject plaintiffs to criminal sanctions in France of up to six (6) months imprisonment and $20,000 in fines. Undoubtedly, fear of criminal prosecution is a substantial excuse for nonproduction. *Societe Internationale*, 357 U.S. at 211, 78 S.Ct. at 1095.

Plaintiffs' fears, however, appear to have no sound basis. There is little evidence that the statute has been or will be enforced. *See Graco*, 101 F.R.D. at 514. Judge Leval's interpretation of the statute's legislative history reveals that the law "was never expected nor intended to be enforced against French subjects." *Adidas*, Slip op. at 8. Judge Leval went on to state:

It is inconceivable that Law No. 80–538 is to be taken at face value as a blanket criminal prohibition against exporting evidence for use in foreign tribunals. For if it were, French nationals doing business abroad would be at the mercy of their business counterparts: they would be unable to redress breaches as frauds committed by suit in foreign courts since they would be barred from supporting their claims with their documents.

*Id.* at 7. This Court concludes, therefore, that plaintiffs face no real threat of prosecution under the French statute. *See id.* at 7–8 & n. 4.

■ Even if criminal penalties were likely to be imposed, however, it would not necessarily be sufficient to warrant nondisclosure in this case. *United States v. First Nat'l Bank*, 699 F.2d 341, 345 (7th Cir. 1983); *In re Grand Jury Proceedings*, 532 F.2d at 407. In *Soletanche*, Judge Grady issued an order compelling French plain-

tiffs, whom he recognized might be subject to criminal sanctions in France for doing so, to violate French Law No. 80–538. 99 F.R.D. at 271–72. Indeed, it must be remembered that the parties resisting discovery in this case are the plaintiffs rather than the defendant. A production order by this Court does not condemn plaintiffs to confinement in a French prison. It merely gives them a choice. They can withdraw their complaint voluntarily at any time or produce the requested documents and risk prosecution under French law. *Ghana Power Commission*, 83 F.R.D. at 594. Thus, the hardship on plaintiffs is insufficient to counsel against issuance of a production order.

### 3. *Location*

Some of the conduct required by a production order would have to occur in France. The gathering of the requested information can be done by plaintiffs, however; the order would not permit defendant to invade French soil. *See Adidas*, Slip op. at 5. Thus, any intrusion on French sovereignty is *de minimis*.

### 4. *Nationality*

Both plaintiffs are French and as such, their nationality militates against issuance of a production order. This factor, however, is not dispositive, *see, e.g., Banca Della*, 92 F.R.D. at 119, and plaintiffs' positions—as a major French shipbuilder and French government agency respectively— give them a favorable position *vis a vis* French authorities.

### 5. *Expectation of Compliance*

 Plaintiffs assert that there is no reasonable expectation that they would or could comply with a production order. The Court disagrees. The French law is not likely to be the subject of strict enforcement. The legislative history of the stat-

ute reveals that its penalties are intended to be imposed, if at all, against French companies that fail to raise the statute as a shield against discovery. *See Adidas*, Slip op. at 9 n. 4 (quoting Report No. 1814, *National Assembly Comm. on Production and Exchanges* (Deputy Mayoud), 1979–80, 2d Sess. 61, 63–64 (June 19, 1980)). Plaintiffs have surely met their obligation in that regard. Weighing unlikelihood of prosecution against the prospect of being deprived of the 32 million dollars allegedly owed them, plaintiffs may well consider it prudent to comply with the production order.[7] It is also conceivable that the French government, being the ultimate beneficiary of any recovery in this action, *see infra* p. 29; may be disposed to permit compliance and waive its right to prosecute.

### 6. *Good Faith*

 Generally, courts only consider the good faith of a party resisting discovery in deciding whether to impose sanctions after a production order is violated. *See Societe Internationale*, 357 U.S. at 208, 78 S.Ct. at 1093; *Arthur Andersen*, 570 F.2d at 1372. The Second Circuit, however, has also considered good faith at the order stage. *Trade Development Bank*, 469 F.2d at 40–41. Plaintiffs contend that their good faith in this matter militates against issuance of a production order. Indeed, plaintiffs have produced a substantial volume of documents. However, it is the content not the quantity of the discovered material that may indicate the existence or absence of good faith. The Court does not suggest that plaintiffs can only demonstrate good faith by producing documents damaging to their case. At the same time, however, sheer volume alone cannot give rise to a presumption of good faith and we decline to draw such an inference. Plaintiffs' good

---

7. *See Soletanche*, 99 F.R.D. at 272 (finding that *Societe Internationale* does not prohibit dismissal of a complaint when the plaintiff fails to in good faith comply with reasonable discovery requests); *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 749 (1976) (affirming a dismissal order against plaintiffs who

failed to comply with discovery orders); *In re Oil Spill*, 93 F.R.D. 840, 842 (N.D.Ill.1982) (a party who has wilfully refused to comply with a discovery order is subject to the sanction of dismissal); *Societe Internationale*, 357 U.S. at 212, 78 S.Ct. at 1095 (dismissal of noncomplying party's complaint allowed if noncompliance in bad faith).

faith, to the extent it exists, does not preclude this Court from issuing a production order.

■ The Court is sensitive to the weighty considerations associated with comity and the need to respect the law of foreign states. Yet, a careful consideration of the factors [8] listed above does not counsel judicial restraint.[9] Plaintiffs come into this Court seeking the protection of United States laws that enable injured persons to recover for breach of contract. Plaintiffs cannot avail themselves of these benefits, yet neglect their accompanying responsibility to disclose all relevant facts to their adversary. *See First Nat'l City Bank,* 396 F.2d at 905; *Banca Della,* 92 F.R.D. at 115; *Soletanche,* 99 F.R.D. at 271; *Ghana Supply Commission,* 83 F.R.D. at 594; *Fontaine v. S.E.C.,* 259 F.Supp. 880, 891 (D.P.R.1966); *cf. Guaranty Trust Co. v. United States,* 304 U.S. 126, 134 & n. 2, 58 S.Ct. 785, 789 & n. 2, 82 L.Ed. 1224 (1938) (Even a foreign sovereign, appearing in American courts as a plaintiff, must subject itself to United States discovery procedures). This is particularly true in view of plaintiffs' connection with the French government and the questionable motives behind passage of the French statute upon which plaintiffs rely. To permit plaintiffs to evade their discovery responsibilities in this case would unfairly disadvantage the defendant and make a mockery of our judicial system. The Court refuses to believe comity compels such a result.

■ Accordingly, plaintiffs are ordered to produce all "old" and "new" Article One documents. The Court reserves judgment on what sanctions will be imposed for failure to comply with this order. Plaintiffs should be aware, however, that the Court will consider imposition of the entire range of sanctions available to it under Rule 37 of the FRCP.

## II. *Defendant's Motion to Compel Production of Ministry Documents*

■ Under Rule 34 of the FRCP, a party may serve on any other party a request to produce documents which are "in the possession, custody or control of the party upon whom the request is served." Defendant's Second and Third Requests for the production of documents held by the French Ministry of Economy and Finance and the Ministry of the Sea were directed to COFACE. COFACE refused to produce the documents, contending that it was not in possession, custody or control of the requested materials. COFACE further asserts that defendant should pursue discovery of Ministry documents through Hague Convention procedures. Defendant, on the other hand, argues that COFACE, as an agency of the French government, is in constructive possession of the Ministry documents.

### A. *Procedural Background*

The key to determining whether COFACE is in possession or control of the Ministry documents lies in the nature of the relationship between COFACE and the

---

**8.** Some courts, in determining whether to issue a production order or impose sanctions for the violation thereof, have also considered the importance of the requested documents to the requesting party's case. *See, e.g., Vetco,* 691 F.2d at 690; *Trade Development,* 469 F.2d at 41; *In re Uranium Antitrust Litigation,* 480 F.Supp. at 1146; *Graco,* 101 F.R.D. at 515–16. This Court finds only that the requested documents are relevant to this litigation. This finding, we believe, was implicit in Judge Brieant's earlier ruling on this matter ordering plaintiffs to seek waivers of the Article One documents requested by defendant. In ordering production of these documents, this Court does not need to find, nor can it find at this point, that the requested

documents are "vital" to a proper defense of this action. *See Graco,* 101 F.R.D. at 515–16. *But see In re Uranium Antitrust Litigation,* 480 F.Supp. at 1146 (suggesting requested documents do need to be "vital").

**9.** Judicial restraint has been found appropriate when the requested information is available from other sources, *Trade Development Bank,* 469 F.2d at 40–42, or the information is sought from a non-party witness, *Ings v. Ferguson,* 282 F.2d at 152. The information in this case, in contrast, is sought from a party and is not available from other sources.

Ministries. This relationship was explored in the July 29, 1983 memorandum opinion by Judge Brieant ("Brieant Mem."). Phillips made a motion to dismiss COFACE's claims on the ground that COFACE was not a real party in interest or alternatively, to stay the action pending joinder of the Ministry of Economy and Finance.

In denying defendant's motion to dismiss or stay pending joinder, Judge Brieant described the relationship between the Ministry of Economy and Finance and COFACE as that of principal and agent. Brieant Mem. at 4. COFACE insures the short-term foreign credit risks of small French companies on its own behalf and in its own name. More importantly, COFACE guarantees larger foreign export contracts, such as the one between CNIM and Multinational, on behalf of the government of France. The French government is an 85 percent shareholder in COFACE (Wachtell Affidavit ¶ 11).

COFACE is not the "alter ego" of the French government for all purposes. Nonetheless, COFACE was an agent of the French government for purposes of the CNIM-Multinational insurance transaction. The decision to issue an insurance policy to CNIM was made by an interministerial commission of the French government. Brieant Mem. at 4. Indeed, it was the Ministry, rather than COFACE, that bore the ultimate risk and responsibility for any payment on the policy. Id. at 3. When Multinational collapsed, COFACE paid CNIM's claims on the insurance policy and the Ministry promptly reimbursed CO-FACE in full. Accordingly, any recovery in this litigation will inure to the benefit of the French treasury (Wachtell Affidavit ¶ 2).

Judge Brieant ruled that COFACE's claims did not have to be dismissed because New York authorizes contract actions to be brought in the name of the agent or the principal. Brieant Mem. at 4. He further held that Rule 19(a)(2) of the FRCP does not require joinder of the Ministry of Economy and Finance. Id. at 5. Having found that COFACE was able to adequately pro-

tect the Ministry's interests and that Phillips was unlikely to face multiple lawsuits arising from the same transaction, Judge Brieant declared that Rule 19 did not require joinder in this case.

COFACE argues that it is significant that, in refusing to order joinder of the Ministry, Judge Brieant rejected Phillips' contention that joinder was necessary to facilitate discovery. Id. at 6. Phillips had argued that only by joining the Ministry as an actual party, with the accompanying broad discovery available against parties, could Phillips fairly have the opportunity to defend the action. COFACE contends that Phillips, having been denied the right to bring the Ministry in as an actual party, should not now be permitted to drag the Ministry into this action as a "constructive" party subject to the broad discovery rules available against parties.

The Court disagrees. Judge Brieant's decision was based on his interpretation of the joinder requirements under Rule 19. This Court, on the other hand, must interpret discovery requirements under Rule 34. It is one thing to require joinder of a foreign government as an involuntary plaintiff, as Judge Brieant was asked to do. It is quite another thing to find that one French agency has custody, possession or control over documents held by another French agency. This Court, therefore, declines to accept COFACE's interpretation of the thrust of Judge Brieant's decision in this area.

### B. *Discussion*

#### 1. *Rule 34*

It is not unusual for documents in the possession of a third party, closely connected to the litigation, to be subject to a Rule 34 request. For example, document requests against a non-party insurer have been upheld on the ground that the insurer is closely akin to a party. *See, e.g., Wilson v. David,* 21 F.R.D. 217, 218–19 (W.D.Mich. 1957); *Bingle v. Liggett Drug Co.,* 11 F.R.D. 593, 593–94 (D.Mass.1951); *Simper v. Trimble,* 9 F.R.D. 598, 599–600 (W.D.Mo. 1949). Similarly, the assignee of a patent

may be subject to discovery as a party. *Natta v. Hogan*, 392 F.2d 686, 691 (10th Cir.1968). These cases are premised on the rationale that a third party with a substantial interest in the litigation cannot be allowed to frustrate the rules of discovery to the disadvantage of a party. *Id.* at 691; *Simper*, 9 F.R.D. at 600. The French government stands to receive any award COFACE may obtain in this action. The Court considers that to be a substantial interest in the litigation. *Cf. In re Uranium Antitrust Litigation*, 480 F.Supp. at 1145 ("issue of control . . . rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate regardless of the formalities of corporate organization").

In *Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586 (D.Mass.1979), a government-sponsored Ghanian corporation, GSC, sued an American company to recover the unpaid portion of the sales price of fuel oil refined in Ghana and sold by GSC to an oil merchant and ultimately resold to the defendant. *Id.* at 587, 591. Defendant served a Rule 34 document request seeking certain records of a Committee of Inquiry established by the Ghanian government to investigate "in camera" the facts surrounding the fuel oil sales. *Id.* at 587–88. The Republic of Ghana, not formally a party to the lawsuit, interposed a claim of executive privilege seeking to withhold Committee documents. *Id.* at 588. On defendant's motion to compel production, the Court held that the GSC was required to produce the withheld documents from the Ghanian government.

In *Ghana Supply Commission*, the Court found—as did Judge Brieant in this case—that the plaintiff was an agent of the Ghanian government for purposes of the lawsuit. *Id.* at 592. In reaching this conclusion, the Court in *Ghana Supply Com-*

*mission* relied on the fact—as in the instant case—that the Ghanian government was the principal of the plaintiff, *id.* at 591, and any recovery of damages would benefit the Ghanian treasury, *id.* at 592 n. 5. Indeed, the connection between GSC's recovery and benefit to the Ghanian treasury was even more attenuated than it is in this case. In *Ghana Supply Commission*, a damage award for plaintiff would simply have reduced GSC's future need for public funds. *Id.* In this case the French government has already reimbursed COFACE and will receive any monies COFACE is awarded.

A similar result was reached in *Soletanche and Rodio, Inc. v. Brown & Lambrecht Earth Movers, Inc.*, 99 F.R.D. 269 (N.D.Ill.1983). A patent infringement action was brought by an American company that was a licensee of a French patent owned by its ultimate corporate parent, Soletanche, S.A., a French corporation. *Id.* at 270. Defendant propounded interrogatories which plaintiff refused to answer on the ground that the information required was not in its possession, custody or control. *Id.* Plaintiff claimed that the information was in the possession of its parent corporations. The Court rejected plaintiff's contention. The suit, the Court found, was brought for the benefit of the parent. *Id.* at 272. The Court ruled that documents within the parent's control are subject to discovery through a Rule 34 request on the parent's agent, the plaintiff.[10]

The Court further rejects COFACE's contention that the Ministries, as separate government agencies, should not be subject to party discovery. Clearly, the Ministry of Economy and Finance was the moving force in the decision to insure the CNIM-Multinational contract and there is some evidence that the Ministry of the Sea also played a part in that decision. To shield

---

**10.** Plaintiff argues that *Soletanche* is inapposite because the parent corporation was an involuntary actual plaintiff in the case, *id.* at 272, whereas the French Ministries are clearly not actual plaintiffs. The Court disagrees. In *Soletanche,* the document request, and subsequent production order, were directed to the subsidiary rather than the parent. The relationship between the subsidiary and parent is *Soletanche* is closely akin to the relationship between COFACE and the French Ministry in this case. Therefore, *Soletanche* is relevant to this matter.

these agencies from discovery because they had COFACE do their bidding is unacceptable.[11] When a government agency is a plaintiff, it has been held that the complaining agency may be required to produce the documents of another agency. *See, e.g., United States v. National Broadcasting Co.,* 65 F.R.D. 415, 419 (C.D.Cal.1974), *appeal dismissed,* 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975); *Bank Line, Ltd. v. United States,* 76 F.Supp. 801, 803–04 (S.D. N.Y.1948) (dictum). In following this position, the Court in *Ghana Supply Commission* stated:

> When an agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff.... If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.

83 F.R.D. at 595 (citations omitted).

The Court appreciates the apparent incongruity of ordering an agent to compel its principal to turn over documents. Nonetheless, if the French government is

to be the ultimate beneficiary of any award for COFACE, it is unacceptable to allow that government to refuse to produce documents necessary for full and fair litigation of this action.[12] For the following reasons, however, the Court defers issuance of a production order.

### 2. *Comity and International Law*

Considerations of comity and international law compel this Court to exercise restraint in this matter. The need to respect the sovereignty of a foreign nation transcends the importance of any particular case. *Volkswagenwerk,* 176 Cal.Rptr. at 884; *see Graco,* 101 F.R.D. at 510 n. 9 (even when there is no conflict with a foreign law, courts should proceed cautiously any time they order discovery involving activities within a foreign country). In order to preserve international harmony, many courts have required that a party, seeking pre-trial discovery abroad, resort to Hague Convention procedures in the first instance. *See, e.g., Philadelphia Gear,* 101 F.R.D. at 61; *Volkswagenwerk,* 176 Cal.Rptr. at 885; *Pierburg,* 186 Cal. Rptr. at 877.

Considerations of international law also weigh in favor of judicial restraint. As Judge Brieant noted in his opinion in this case, the Hague Convention and the FRCP are both entitled to be recognized as the "supreme law of the land." Brieant Op. at 11. When there is a direct conflict, the

---

**11.** *Cf. General Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d 1204, 1211 (8th Cir.1973) (requiring defense against multi-million dollar claim "without benefit of ... discovery" would "work an extreme injustice"), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); *Lyons v. Johnson,* 415 F.2d 540, 542 (9th Cir.1969) ("the scales of justice would hardly remain equal ... if a party can assert a claim against another and then be able to block all discovery attempts against him ..."), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Von der Heydt v. Kennedy,* 299 F.2d 459, 462–63 (D.C. Cir.) (in affirming dismissal of complaint following foreign plaintiff's refusal to produce documents or answer an interrogatory, approved district court's explanation that plaintiff's refusal "deprive[d] defendants of a full and fair opportunity to prepare their defenses and would deprive this court of evidence indispensable to a proper adjudication of the issues"), *cert. denied,*

370 U.S. 916, 82 S.Ct. 1554, 8 L.Ed.2d 498 (1962).

**12.** In *Sharon v. Time, Inc.,* 599 F.Supp. 538, at 560 (S.D.N.Y.1984), the Court declined to dismiss the libel action of a former Israeli defense minister after the Israeli government refused to produce certain documents requested by Time. *Sharon,* is distinguishable from this case for two reasons. First, it involved a request for military, rather than commercial information. Military information has traditionally been accorded greater protection by American courts. *See Reynolds,* 345 U.S. at 6–7, 73 S.Ct. at 531–532. Second, it is Sharon, not the Israeli government, that stood to benefit from a favorable verdict in that case. In this case, as the Court has stated, the French government will be the primary beneficiary if COFACE succeeds on the merits of its claims.

Court must—as it did in the first part of the opinion—choose which law should govern. Absent a direct conflict, however, it is the duty of this Court to enforce them both. *Id.* At this stage of the proceeding, no direct conflict exists. Although Hague Convention procedures are not the exclusive means of taking evidence abroad, *see supra* pp. 14–18, as regards the information sought from the French ministries in this case, those procedures should be defendant's first avenue of discovery.

Accordingly, defendant is directed to, in good faith, utilize the procedures set forth in Articles 17 to 22 of the Hague Convention to gather information currently in possession of the French Ministry of Economy and Finance and the Ministry of the Sea. Should this prove to be a futile gesture, defendant is invited back to this Court to make a motion for an order compelling COFACE to produce the Ministry documents. It is hoped that this opinion, having outlined this Court's position on the propriety of a production order, may spur cooperation by the French government under Hague Convention procedures.

III. *Plaintiff's Motion for Separate Trial on the Issues of Liability and Damages*

 Plaintiffs make a motion for an order: (1) pursuant to Rule 42(b) of the FRCP directing that separate trials be had in this action on the issues of liability and damages, and (2) pursuant to Rules 26(c) and (d) staying all further discovery on the issue of damages pending resolution of the trial on liability.

Rule 42(b) provides in part:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial ... of any separate issue.

Rule 42(b) was designed to give courts the discretion to order separate trials when such an order would promote convenience or avoid prejudice. 9 Wright & Miller, Fed.Prac. & Proc.: Civ. § 2388 (1971 ed.).

A single trial "tends to lessen the delay, expense and inconvenience to all concerned, and the courts have emphasized that separate trials should not be ordered unless such a disposition is clearly necessary." *Wolens v. F.W. Woolworth Co.*, 29 Fed.R. Serv.2d 1521, 1521 (N.D.Ill.1980). Although "bifurcated trials have been employed with great success," *In re Master-Key Antitrust Litigation*, 528 F.2d 5, 15 (2d Cir.1975), the piecemeal trial of separate issues in a single suit is not the usual course. Advisory Committee Note to the 1966 Amendment to Rule 42(b); Wright & Miller, *supra*, § 2388, at 279; *see, e.g., Electronic Assistance Corp. v. City of New York*, 362 F.Supp. 755, 757 (S.D.N.Y. 1973); *Bridgestone Trading Co. v. Envoys U.S.A., Inc.*, 37 Fed.R.Serv.2d 1295, 1295 (N.D. Ohio 1983); *Magnavox Co. v. APF Electronics, Inc.*, 32 Fed.R.Serv.2d 1159, 1161 (N.D.Ill.1981); *Ingram Corp. v. J. Ray McDermott & Co.*, 495 F.Supp. 1321, 1334 (E.D.La.1980); *Federal Deposit Insurance Corp. v. First Nat'l Bank*, 496 F.Supp. 291, 294 (W.D.Okla.1978). Bifurcation of liability and damage issues has been ordered. *See, e.g., In re Ampicillin Antitrust Litigation*, 88 F.R.D. 174, 178–79 (D.D.C.1980) (antitrust); *Kushner v. Hendon Constr., Inc.*, 81 F.R.D. 93, 98–99 (M.D.Pa.1979) (personal injury); *Shepard v. International Business Machines Corp.*, 45 F.R.D. 536, 537 (S.D.N.Y.1968) (patent infringement). Plaintiffs, however, have failed to uncover bifurcation of any cases involving attempts to pierce a corporate veil.

Nonetheless, this Court retains the discretion to order separate trials in this case if it would serve the purposes of Rule 42(b). *See* Wright & Miller, *supra*, § 2388. In *Xerox Corp. v. Nashua Corp.*, 57 F.R.D. 25, 26 (S.D.N.Y.1972), Judge Lasker set forth the following factors for a court to consider in determining whether to order separate trials:

(1) Is the issue to be tried first significantly different than that which will be held in abeyance? Will the separate issues require the testimony of different witnesses and documentary proof?

(2) Are the issues triable by jury or by court or one by jury and the other by court?

(3) Does the posture of discovery as to the respective issues suggest that they should or should not be tried together?

(4) Will the party opposing the severance be prejudiced if it is granted?

### 1. *Degree to Which Issues and Proof Thereof Overlap*

■■■ The most critical factor to consider is the degree to which the issues to be tried separately differ. *Id.* at 26. According to plaintiffs, there is virtually no overlap between the liability and damage issues. The liability question, under plaintiffs' analysis, centers on whether the CNIM-Multinational contract was breached and whether the corporate veil of Phillips can be pierced. Defendant's liability, therefore, will turn on the extent to which Phillips dominated or controlled Multinational and proof will focus on statements of Multinational and Phillips' employees. Plaintiffs predict that relevant testimony will come from employees of COFACE, CNIM, Multinational and shareholders of Multinational concerning negotiation of the CNIM-Multinational contracts in 1974 and pre-dissolution dealings between the parties from 1974 to 1977. Totally separate from these matters, plaintiffs contend, is the issue of damages, which allegedly concerns the discreet question of reasonableness of the resale of Newbuildings 1416 and 1417 in 1979. Resolution of this issue will purportedly center on the testimony of shipping experts concerning the state of the liquified petrochemical gas tanker market after Multinational's dissolution. Plaintiffs contend that their only employees that might testify would be from COFACE's claims department and would not have been involved in any pre-default dealing with Multinational or its shareholders.

■■■ Defendant basically agrees with plaintiffs that the liability issue is whether in extending credit to, and insuring the credit of, Multinational, plaintiffs in fact relied upon the Multinational shareholders. As to the damage issue, however, defendant posits the issue as whether plaintiffs failed to mitigate damages by proceeding with construction of Newbuildings 1416 and 1417 after Multinational's default. According to defendant, a single issue threads through both the liability and damage issues: What was the French government's motivation in insuring the CNIM-Multinational contract and in completing construction of the vessels after Multinational's default. Defendant argues that the French government, acting through COFACE, was motivated to insure the contract and continue production solely to keep the CNIM shipyard and workforce in operation and avoid the financial, social and political consequences of a shutdown of the shipyard for lack of work. This motivation, under defendant's analysis, led COFACE to accept Multinational's own balance sheet and business prospects as the credit for the Newbuildings 1416 and 1417 shipbuilding contracts rather than looking to Multinational's default. This was done to avoid the social and political consequences of termination, rather than on the basis of commercially reasonable considerations. Defendant concludes that it should not be saddled with damages traceable to French political imperatives rather than any wrongdoing on its part.[13]

The Court agrees with plaintiffs' assessment that a substantial amount of proof in the liability and damage issues will not overlap. Nevertheless, defendant's theory indicates that the issues are not sufficiently distinct, nor is the proof sufficiently separate, to warrant a bifurcation order in this case.

### 2. *Jury Trial*

Both the liability and damage claims may have to be tried by a jury. Bifurcation

---

**13.** Beyond outlining its theory, defendant has failed to specify the degree to which proof of the two issues will overlap. At least part of defendant's problem, the Court should note, is

that plaintiffs have not produced many of the documents that defendant might use in establishing the degree of overlap.

may therefore require this Court to choose between having one jury hear both trials or impanelling a different jury for each trial. Neither course is practical.

If one jury is to hear both trials and Phillips is found liable, the jury would have to sit by indefinitely while the parties complete discovery before a trial on damages could commence. *Brad Ragan, Inc. v. Shrader's Inc.*, 89 F.R.D. 548, 551 (S.D. Ohio 1981). To try the damage issue before a different jury, in view of the overlap of issues, would not promote judicial economy. *Id.* at 550. Consequently, this factor mitigates against bifurcation.

### 3. *Posture of Discovery*

Plaintiffs assert that a bifurcation order will resolve, at least temporarily, the lingering discovery dispute involving the Article One and French Ministry documents. Plaintiffs contend that the disputed documents relate principally to the issue of damages and therefore defendant will not be prejudiced by bifurcation. If the Court were to order separate trials, discovery relating to the damage issue could be stayed pursuant to Rules 26(c) and (d) of the FRCP, which grant a district court the authority to control the sequence and timing of discovery. Such a postponement, plaintiffs claim, would result in a substantial savings of time and money for all concerned.

Plaintiffs' argument, while initially attractive, is, on closer inspection, simply another approach to further evading their discovery responsibilities. The underlying assumption of plaintiffs' argument is that all the materials they have failed to produce pertain exclusively to the damage issue. In view of the overlap between the liability and damage issues, it is unlikely the requested documents relate exclusively to damages. Therefore, the posture of discovery does not mitigate in favor of bifurcation in this case.

### 4. *Prejudice to Defendant*

If the Court accepted plaintiffs' assertions that the damage and liability issues do not overlap and that the documents not yet produced by plaintiffs pertain exclu- sively to damages, then the Court would probably accept plaintiffs' next contention that defendant will not be prejudiced as a result of bifurcation. Having failed to accept plaintiffs' initial contentions, however, it is clear bifurcation could prejudice defendant. An order for separate trials, with or without a stay of discovery, could force defendant to go to trial without the facts necessary for it to have a fair opportunity to defend the action.

Having failed to find that bifurcation of the issues of liability and damages will serve the interests of convenience and fairness, the Court denies plaintiffs' motion for separate trials.

### IV. *Plaintiffs' Motion to Compel Production of Documents and Answers to Interrogatories*

Plaintiffs move under Rule 37(a)(2) of the FRCP for an order compelling defendant to produce documents requested by plaintiffs in their "Second Request for Production of Documents." In addition, plaintiffs renew their motion of August 18, 1982 for an order compelling defendant to provide specific and responsive answers to the interrogatories propounded in plaintiffs' first set of interrogatories.

 Defendant makes a general objection to document request and interrogatories on the basis of plaintiffs' failure to produce the documents defendant has requested. Without commenting on the legal validity of this objection, it is no longer well founded. This Court has ordered production of all "old" and "new" Article One documents. As to the Ministry documents, this Court has indicated that should the French government wish to ultimately recover its payments to COFACE, it will have to cooperate in compliance with reasonable discovery requests. Defendant also urges that it should not have to produce documents or answer interrogatories until plaintiffs fully comply with all defendant's requests to date. This Court is not inclined to put defendant in the position of one who has given its opponents all the information necessary to prosecute their claims only to

be denied the information held by plaintiffs or the French government that would enable defendant to fairly defend the action. These general objections, therefore, are without merit.

### A. Document Requests

Plaintiffs' second document demand consists of five requests for personnel information purportedly relating to the extent to which Phillips' personnel performed services for and directed the activities of Multinational. In this action by plaintiffs, which seeks to pierce the Multinational corporate veil, this type of request appears reasonable. Some of the requested materials, however, need not be produced.

■ *Request No. 1:* Plaintiffs seek all entries from diaries, logs, telephone records, travel and expense account records, and the like "relating in any manner" to this litigation for 23 specified employees and any other Phillips' employee, director or officer who performed any other activity relating to Multinational. Phillips, as the Court understands it, is prepared to produce documents not otherwise privileged—with the exception of travel and expense account records—with respect to the 23 enumerated individuals (Phillips' Memorandum in Opposition at 8). Plaintiffs say they would be satisfied, for the moment, to receive all requested information on the 23 named individuals plus Messrs. L.A. Peterson, Charles Morley and D.C. Walters (Hagan Reply Affidavit ¶ 5). The Court does not think production of travel and expense account records for the 26 individuals in question would be unduly burdensome. To avoid wasted effort by either side, however, the Court directs Phillips to produce the requested materials, absent the travel and expense account records. Should plaintiffs, upon reviewing those materials, determine in good faith that the travel and expense account records of any or all of the named individuals are relevant to this litigation they may, without leave of Court, request those documents from defendant. Upon the receipt of such

a request, defendant is directed to produce those documents.

The Court need not rule at this time on whether Phillips must provide the requested information as to "any" Phillips employee connected to Multinational. We note, however, for purposes of guidance, that while this request appears overly broad, the requested information is within Phillips' particular knowledge. Obviously, plaintiffs' request does not seek the records of employees who performed ministerial functions, it only refers to the records of those Phillips' employees that dealt with Multinational on a substantive level (Hagan Reply Affidavit ¶ 5). Should plaintiffs, after reviewing the materials already ordered to be produced, determine that information on other Phillips' employees is needed and should Phillips refuse to comply with appropriate demands, plaintiffs may return to Court and move for a production order. The more specific the requests, the more inclined the Court will be to grant them.

*Request No. 2:* Plaintiffs request the personnel records, including documents pertaining to personnel reviews and compensation history of any officer, director or employee of Phillips whose services were "loaned" or "seconded" to Multinational. We assume, since plaintiffs, for the moment, seek only the materials pertaining to the 26 individuals specified in the Court's discussion of request no. 1, this request for personnel records relates only to those 26 named persons. The Court recognizes that plaintiffs may also need production of the files of other Phillips' employees who did work for Multinational. Without curtailing plaintiffs' right to make such requests in the future, we rule only on the requested personnel files of the 26 individuals named in request no. 1. Defendant objects to disclosure of these files on the basis of the confidential nature of the information sought. In this regard, defendant's objection has some merit.

In *New York Stock Exchange, Inc. v. Sloan*, 22 Fed.R.Serv.2d 500, 505 (S.D.N.Y. 1976), Judge Lasker refused to compel pro-

duction of defendant's personnel files in a securities fraud case. The court noted that the files sought were the type "employees justifiably expect to be kept confidential" and that to reveal their contents "would invade the employees' privacy." *Id.* at 503. Moreover, disclosure would discourage the candid evaluation of employees and consequently hamper the ability of firms to maintain their standards and improve their performance. *Id.* In view of these considerations, Judge Lasker concluded that production of personnel files should not be ordered:

> ... unless it clearly appears that they are relevant to the subject matter of the action or to the issues raised thereunder and, further, that there is a compelling need therefor because the information contained therein is not otherwise readily obtainable.

*Id.* at 504; *cf. Smith v. Bader,* 83 F.R.D. 437, 438 (S.D.N.Y.1979) (limited disclosure of tax returns under *Sloan* test); *Shaver v. Yacht Outward Bound,* 71 F.R.D. 561, 563–64 (N.D.Ill.1976) (same). *But see In re Hawaii Corp.,* 88 F.R.D. 518, 524 (D.Hawaii 1980) (*Sloan* does not create an automatic bar to discovery of personnel files).

■ The compensation records of the 26 named Phillips employees may have relevance to the issue of piercing the corporate veil. If these Phillips employees received compensation from or worked on projects for Multinational, that might be probative evidence that Multinational and Phillips are "alter egos" for purposes of piercing. *See* Henn & Alexander, Law of Corporations § 148, at 355 (3d ed. 1983) (intermingling of employees supports piercing claim). But the personnel evaluations of these individuals, which should remain confidential whenever possible, are not clearly relevant. Surely, one can imagine a scenario where an evaluation might contain references to work performed for Multinational that is not disclosed elsewhere. Nonetheless, the other materials Phillips is directed to supply to plaintiffs is likely to provide the relevant information. The thrust of a personnel evaluation is the quality of the employee's work, not the nature of the work. The public policy considerations favoring confidentiality and the likelihood that the relevant information will be supplied to plaintiffs through other materials leads this Court to direct Phillips to produce the requested personnel files absent personnel evaluations. Should it turn out that relevant information, which plaintiffs reasonably believe to exist in the evaluations, is not available elsewhere, the Court will hear argument why this redaction of personnel evaluations should not be permitted.

*Request No. 3:* Plaintiffs request all diaries, logs, telephone records, expense account records and calendars relating to matters involved in this litigation for officers, directors or employees of Phillips "loaned" or "seconded" to Multinational. This request is similar to request no. 1 and defendant is directed to produce these materials for the 26 persons named in request no. 1 consistent with the order relating thereto. Again, this order is made without prejudice to plaintiffs' right to request information on other Phillips employees, officers or directors in the future if such additional information is relevant.

*Request No. 4:* Plaintiffs next seek all documents obtained by Phillips' counsel from third parties in connection with counsel's preparation of Phillips' defense in this action. Defendant objects to this request on three grounds: (1) discovery sought is available from a more convenient source; (2) plaintiff has had ample opportunity through prior discovery to obtain the information sought; and (3) the materials sought are privileged as counsel's work product. Defendant's bare allegations in support of its first two objections are unconvincing. Defendant's assertion of the work product privilege, however, merits more discussion.

■ The issue is whether materials that a party acquires from third parties in preparation for litigation fall within the work product privilege described in Rule 26(b)(3) of the FRCP. The primary purpose of the work product doctrine is to

protect the mental impressions, opinions, and legal theories prepared by an attorney in anticipation of litigation. *Hickman*, 329 U.S. at 510–11, 67 S.Ct. at 393–94. Under Rule 26(b)(3), three conditions must be satisfied in order to establish work product protection. The material in question must: (1) be a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for its representative. *In re Grand Jury Subpoenas*, 561 F.Supp. 1247, 1257 (S.D.N.Y.1982).

The work product immunity generally "extends only to those documents prepared in anticipation of litigation," *Garfinkle v. Arcata Nat'l Corp.*, 64 F.R.D. 688, 690 (S.D.N.Y.1974), and the burden of showing that the materials were prepared in anticipation of litigation is on the party asserting the privilege. *Ferri v. United States Dep't of Justice*, 573 F.Supp. 852, 865 (W.D.Pa.1983); *United States v. Willis*, 565 F.Supp. 1186, 1219 (S.D.Iowa 1983); *Feldman v. Pioneer Petroleum, Inc.*, 87 F.R.D. 86, 88 (W.D.Okla. 1980). Generally, there is no work product immunity for documents, such as those involved here, that were prepared in the regular course of business prior to the onset of litigation. *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 82 F.R.D. 702, 708 (S.D.N.Y.1979), *modified on other grounds*, 484 F.Supp. 1153 (S.D.N.Y.1980); *Galambus v. Consolidated Freightway Corp.*, 64 F.R.D. 468, 472 (N.D.Ind.1974); *United States v. Maryland Shipbuilding & Drydock Co.*, 51 F.R.D. 159, 160 (D.Md. 1970). Documents prepared by third parties contemporaneous with the events to which the documents relate cannot fairly be deemed to have been prepared in anticipation of litigation.

For example, in *Status Time Corp. v. Sharp Electronics Corp.*, 95 F.R.D. 27 (S.D.N.Y.1982), a party sought to withhold pre-existing documents, primarily patent applications, that had been prepared by third parties. Although these documents were assembled by plaintiff's counsel in preparing his case, the Court rejected the contention that they were protected by the work-product privilege:

> The plaintiff has failed to show that the document was prepared with an eye toward the litigation. All the documents for which the privilege is claimed were generated before this lawsuit arose or was in prospect. They are not protected by the attorney work-product doctrine.

*Id.* at 29. Similarly, in *Zucker v. Sable*, 72 F.R.D. 1, 3 (S.D.N.Y.1975), the plaintiff refused to produce requested documents, claiming, as Phillips does in this case, that they had been located by his counsel in preparing his case. The documents included press releases, newspaper articles, advertisements, and similar pre-existing materials prepared for non-litigation purposes. The Court held that the work-product protection is limited to items which involve a lawyer's professional skill and experience, and therefore that "the documents in question, which were not originated by counsel in the preparation of his case, are not immune from discovery." *Id.; see Dixon v. Cappellini*, 88 F.R.D. 1, 3 (M.D.Pa.1980) (pre-existing psychiatric reports assembled by counsel in preparation of his case are not work product because they were not "originated by counsel").

Courts have sustained objections to this type of discovery request when the requesting party was simply attempting to exploit the work of his opponent. In *Rincon Band v. United States*, No. 80–A, Slip op. (Ct.Cl.1980), for example, plaintiff was seeking documents copied and collected from government archives by the government's expert consultant. In denying plaintiff's motion to compel production of the documents, the Court declared that the liberal discovery rules of the FRCP "were not intended to be made the vehicle through which one litigant could make use of his opponent's preparation of his case. To use them in such a manner would penalize the diligent and place a premium on laziness." *Id.* at 2; *accord McCarthy v. Palmer*, 29 F.Supp. 585, 586 (S.D.N.Y. 1939); *see Pickett v. L.R. Ryan, Inc.*, 237 F.Supp. 198, 199–200 (E.D.S.C.1965) (denied

plaintiff's request for production of a case file maintained by defendant's insurer because plaintiff did not even know whether file was relevant).

■ These cases, which involved parties attempting to evade their responsibilities and exploit their opponents' labors, carve out an exception to the general rule that limits the work-product privilege to work done in anticipation of litigation. Rather than evading their responsibilities, however, counsel for both parties in this case have pursued their clients' interests to the utmost in a thoroughly professional manner. Accordingly, plaintiffs' motion to compel production of the materials embodied in request no. 4 is granted.

■ *Request No. 5:* Plaintiff's fifth request calls for production of personnel, payroll and other compensation records of Herman Sauer, from the time he was first employed by Phillips or any of its subsidiaries. Phillips agrees to produce all post-1968 information on Mr. Sauer (Phillips Memorandum in Opposition at 18). Phillips objects to producing documents prior to January 1, 1969 on the grounds of burdensomeness and relevance. Phillips conclusory allegations of undue burden and irrelevance are insufficient grounds to sustain its objection in the face of what is, in view of the scope of this lawsuit, such a specific request. Phillips is directed to produce all requested documents pertaining to Mr. Sauer.

## B. *Interrogatories*

Plaintiffs renew their 1982 motion to compel defendant to answer plaintiffs' interrogatories. Defendant likewise renews its 1982 objections to the interrogatories.

At the outset, the Court notes that cases involving an attempt to pierce a corporate veil are complicated. *See Worldwide Carriers, Ltd. v. Aris Steamship Co.,* 301 F.Supp. 64, 67–68 (S.D.N.Y.1968) (many factors relevant in piercing case). This case is no exception. Moreover, this Court has been generous with defendant's discovery requests and to be stingy with plain-

tiffs' requests could put plaintiffs at an unfair disadvantage. Defendant's objections, which have some merit, are reviewed below. Plaintiffs' motion is granted with specific directions to defendant on the form of its answers.

1. *Unduly Burdensome and Oppressive*

■ Defendant contends that plaintiffs' interrogatories, which are admittedly lengthy at 57 pages, are overwhelmingly burdensome and should be stricken *in toto.* While lengthy interrogatories have been stricken on the basis of irrelevance, sheer numerosity is not a valid objection. Advisory Committee Notes to 1946 Amendment to FRCP 33; 4A Moore's Federal Practice ¶ 33.08[2], at 33–55 to 33–56, ¶ 33.20, at 33–100 to 33–103 (2d ed. 1982); *see, e.g., Bayden v. Troken,* 60 F.R.D. 625, 626 (N.D.Ill.1973); *Hutter v. Frederickson,* 58 F.R.D. 52, 54 (E.D.Wis.1972); *Roesberg v. Johns-Mansville Corp.,* 85 F.R.D. 292, 297 (E.D.Pa.1980). Defendant cannot evade its discovery responsibilities by "simply inton[ing] this familiar litany" that the interrogatories are burdensome, oppressive or overly broad. *Roesberg,* 85 F.R.D. at 296; *see White v. Beloginis,* 53 F.R.D. 480, 481 (S.D.N.Y.1971); *United States v. NYSCO Labs., Inc.,* 26 F.R.D. 159, 161 (S.D.N.Y. 1960). In *Roesberg,* the Court articulated defendant's burden:

> [Defendant] must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive, *Trabon Engineering Corp. v. Easton Manufacturing Co.,* 37 F.R.D. 51, 54 (N.D. Ohio 1964), *Stanley Works v. Haeger Potteries, Inc.,* 35 F.R.D. 551, 555 (N.D.Ill.1964), by submitting affidavits or offering evidence revealing the nature of the burden. *Leumi Financial Corp. v. Hartford Accident & Indemnity Corp.,* 295 F.Supp. 539, 544 (S.D.N.Y.1969), *Wirtz v. Capital Air Service, Inc.,* 42 F.R.D. 641, 643 (D.Kan.1967). The court is not required to "sift each interrogatory to determine the usefulness of the answer sought."

*Klausen v. Sidney Printing & Publishing Co.,* 271 F.Supp. 783, 784 (D.Kan. 1967). *See also Hoffman v. Wilson Line, Inc.,* 7 F.R.D. [73] at 74 [ (D.C.Pa. 1946) ]. The detail in the complaint specifies the necessary relevance of the interrogatories. *In re Folding Carton Antitrust Litigation,* 83 F.R.D. [251] at 254 [ (D.C.Ill.1978) ], *McClain v. Mack Trucks, Inc.,* 85 F.R.D. [53] at 57 [ (D.C. Pa.1979) ]. The burden now falls upon . . . the party resisting discovery, to clarify and explain its objections and to provide support therefor. *Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913, 916–17 (E.D.Pa.1979), *In re Folding Carton Antitrust Litigation,* 83 F.R.D. 260, 265 (N.D.Ill.1979), *Robinson v. Magovern,* 83 F.R.D. 79, 85 (E.D.Pa.1979), *Flour Mills of America, Inc. v. Pace,* 75 F.R.D. 676, 680 (E.D.Okl.1977).

85 F.R.D. at 296–97. Phillips has failed to meet its burden in this regard.

### 2. *Alternative Sources, Work Product Privilege, Attorney-Client Privilege*

■ Defendant objects to the interrogatories on the ground that the information sought is readily available from other sources and by turning it over, defendant would be doing plaintiffs' trial preparation. This is, in effect, a work product privilege similar to that made by Phillips in opposing plaintiffs' document requests. Phillips also makes an explicit assertion of work product privilege in opposition to plaintiffs' interrogatories. All these objections amount to the same argument and the Court finds the argument to be without merit. Phillips also asserts a claim of attorney-client privilege, but fails to set forth the underlying facts that demonstrate the existence of the privilege. This objection is also overruled. *See In re Shopping Carts Antitrust Litigation,* 1982–1 Trade Cas. ¶ 64,612, at 73,-345 (S.D.N.Y. March 11, 1982).

### 3. *Ambiguity*

■ Defendant argues that the ambiguity of the interrogatories precludes it from responding. The Court directs defendant, in answering the interrogatories, to attribute to any terms which it thinks are ambiguous their common, everyday meaning. *See Roesberg,* 85 F.R.D. at 298.

### 4. *Depositions More Appropriate*

■ Defendant objects to several interrogatories on the ground that they purportedly ask for evidentiary detail more appropriately elicited at depositions. However, information obtained by interrogatories:

. . . may effect judicial economy and economic savings to the parties. Plaintiffs will know whom they have to depose; unnecessary depositions may be avoided; information which might not be obtained from the corporate defendants; important conversations, communications and documents will be highlighted; delay may be avoided; and the issues for trial may be narrowed.

*In re Shopping Carts Antitrust Litigation,* 95 F.R.D. 299, 1982–1 Trade Cas. ¶ 64,561, at 73,074 (S.D.N.Y.1982). For these reasons, the Court believes plaintiffs' interrogatories may effect judicial economy. As a result, we find defendant's objection to be without merit.

### 5. *Rule 33(c)*

■ Defendant next seeks resort to Rule 33(c) of the FRCP which provides: Option to Produce Business Records. Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilation, abstracts or summaries. A specification shall be in

44

sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

Rule 33(c) permits a party to answer detailed interrogatories by providing business records where the answers can be found. The idea behind the rule is that when the burden of deriving information from documents is equal between the parties, the interrogating party should bear the burden of compiling the information. *See Sandler v. Musicland Pickwick Int'l, Inc.*, 31 Fed. R.Serv.2d 760, 761–62 (E.D.Tex.1980); *Webb v. Westinghouse Elec. Corp.*, 81 F.R.D. 431, 435–36 (E.D.Pa.1978); *Mid-America Facilities, Inc. v. Argonaut Co.*, 78 F.R.D. 497, 498 (E.D.Wis.1978). One party's familiarity with the documents does not necessarily create a disparity in the ease of discovery that would preclude resort to Rule 33(c). *Sandler*, 31 Fed.R. Serv.2d at 761.

▇▇▇▇ On the other hand, Rule 33(c) does not allow a respondent to foist a mass of records on his interrogator when their deciphering is feasible only for one familiar with the records. Advisory Committee Note to the 1970 Amendment to Rule 33(c). Defendant's response must, to some extent, specify the appropriate documents from which the information sought can be derived. It is "an abuse of the [Rule 33(c)] option" to merely direct the interrogating party to a mass of business records. Advisory Committee Note to the 1980 Amendment to Rule 33(c); *see Budget Rent-A-Car, Inc. v. Hertz Corp.*, 55 F.R.D. 354, 357 (W.D.Mo.1972) ("a broad statement that the information sought is ascertainable generally from the documents ... is not a sufficient answer"); *In re MasterKey Litigation*, 53 F.R.D. 87, 90 (D.Conn.1971) ("it is not plausible to assume that a response that an answer may (or may not) be found in its records, accompanied by an offer to permit their inspection is sufficient [under Rule 33(c)]"). Finally, Rule 33(c) is not an available alternative if an interrogatory can be responded to more readily and conveniently by written answer. *See Dai-*

*flon, Inc. v. Allied Chemical Corp.*, 534 F.2d 221, 226 (10th Cir.), *cert. denied*, 429 U.S. 886, 97 S.Ct. 239, 50 L.Ed.2d 168 (1976); *Atlanta Fixture & Sales Co. v. Bituminous Fire & Marine Ins. Co.*, 51 F.R.D. 311, 312 (N.D.Ga.1970).

▇▇▇▇ The 1983 amendments to FRCP 26(b)(1) were designed to encourage courts to more aggressively identify and curtail discovery abuse. Advisory Committee Note to the 1983 Amendment to Rule 26(b)(1). To that end, this Court can restrict the number of interrogatories. The Court, however, must be careful not to deprive a party of discovery necessary to the preparation of its case. *See Hickman*, 329 U.S. at 507, 67 S.Ct. at 391 ("discovery rules are to be accorded a broad and liberal treatment"); *Aktiebolaget Vargos v. Clark*, 8 F.R.D. 635, 636 (D.D.C.1949) ("The utmost liberality should prevail in allowing a wide scope to the legitimate use of interrogatories. This course is in the interest of a fair trial, eliminating surprise and achieving substantial justice.").

▇▇▇▇ In view of all the foregoing considerations, the Court directs defendant to provide written answers to every interrogatory except those for which an answer may be derived from a business record and the burden of deriving the answer is substantially the same for defendant as it is for plaintiffs. In the case of those interrogatories answered with business records, defendant shall specify which documents pertain to each of the 183 separately numbered interrogatories. Defendant need not correspond the documents to all 500 subparts of the interrogatories.

CONCLUSION

Defendant's motion to compel production of all documents for which plaintiffs' have invoked executive privilege and Article One of French law No. 80–538 is granted. Defendant's motion to compel production of French Ministry documents is held in abeyance. Defendant is directed to first attempt to obtain the Ministry documents through Hague Convention procedures.

Plaintiffs' motion for separate trial on the issues of liability and damages is denied.

Plaintiff's motion to compel production of documents is granted in all respects as to the 26 named individuals. Their personnel evaluations do not have to be produced and their travel and expense account records only have to be produced if plain-. tiffs, after reviewing the other documents, still consider the records relevant and inform defendant of their finding. Plaintiffs' motion to produce documents as to unnamed individuals is held in abeyance. Plaintiffs' motion to compel answers to interrogatories is granted. Defendant is to respond by written answer or, if answer by provision of business records is proper under Rule 33(c), defendant shall specify which records answer each interrogatory. Defendant need not correspond records to the subparts of each interrogatory.

SO ORDERED.